**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MR. BUDIONO, *Petitioner*, v. LORETTA E. LYNCH, Attorney General, *Respondent*. | No. 12-71804 Agency No. A078-020-384 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted December 8, 2015
Pasadena, California

Filed September 21, 2016

Before: Harry Pregerson, A. Wallace Tashima,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima;
Partial Concurrence and Partial Dissent by Judge Callahan

## SUMMARY[*]

### Immigration

The panel granted a petition for review of the denial of withholding of removal to a citizen of Indonesia concluding that substantial evidence did not support the Board of Immigration Appeals' determination that the organization petitioner supported, the Jemaah Muslim Attaqwa ("JMA"), engaged in terrorist activities.

The panel agreed with the Board that petitioner's asylum application was time barred because petitioner failed to establish that he qualified for the changed circumstances exception to the asylum one-year time bar.

Applying the same burden-of-proof framework applied in the context of the persecutor bar, the panel held that the government must make a threshold showing of particularized evidence raising the inference that each element of the terrorist bar, 8 U.S.C. § 1182(a)(3)(B)(i), could be met before placing the burden on the applicant to rebut it.

The panel held that the immigration judge failed to make the requisite factual findings to support his conclusion that the JMA was a terrorist organization, and that petitioner's support of the JMA therefore did not bar him from withholding of removal under the terrorist bar.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel noted that the Board had twice considered and failed to make adequate findings to support application of the bar. The panel concluded that remand was therefore not appropriate, and held that petitioner was eligible for withholding of removal.

Concurring in part and dissenting in part, Judge Callahan agreed that petitioner's asylum application was time barred but would hold that the government met its initial burden by presenting evidence indicating that JMA is a terrorist organization. Judge Callahan wrote that the majority improperly inflated the government's initial burden, and that even if she agreed with that standard, the appropriate remedy in this case is remand to the Board.

---

## COUNSEL

Armin A. Skalmowski (argued), Alhambra, California, for Petitioner.

Daniel I. Smulow (argued), Trial Attorney; Lyle D. Jentzer, Senior Litigation Counsel; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

---

## OPINION

TASHIMA, Circuit Judge:

Budiono, a native of Indonesia, petitions for review of a Board of Immigration Appeals' (the "Board") decision affirming the Immigration Judge's ("IJ") order of removal. The IJ determined that although Budiono otherwise qualified for withholding of removal, he was barred from relief due to his material support of a terrorist organization. We have jurisdiction under 8 U.S.C. § 1252(a). We conclude that substantial evidence does not support the IJ's finding that the organization engaged in terrorist activities; we therefore grant the petition for review.

## I.

### A.  Factual Background

Budiono entered the United States on July 11, 2000, on a nonimmigrant visitor's visa. He remained in the United States after his visa expired. In 2003, after Budiono registered under the former National Security Entry-Exit Registration System program, the Department of Homeland Security ("DHS") initiated removal proceedings. Although Budiono conceded removability, he applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

In support of his claims, Budiono credibly testified[1] to the following:  In about 1990, when he was 17 years old, Budiono joined a Jakarta-based Muslim community group Jemaah Muslim Attaqwa ("JMA").  At the time, the JMA's primary purpose was to provide volunteer services to the neighborhood, including fixing homes, delivering medicine to people in hospitals, and teaching the tenets of Islam to children and the poor.  Around 1998, the group's rhetoric began to change, becoming increasingly intolerant of non-Muslims.  Members of the JMA participated in violent anti-government riots in May 1998 and may have caused the deaths of at least two people, as well as substantial property destruction, during the riots.  Budiono testified that he did not take part in the riots and disagreed with the JMA's increasingly militant stance.

In February 2000, the JMA asked Budiono to lead its fundraising efforts.  The group hoped to use the funds to build a new mosque.  Budiono understood that the fundraising position would require him to use "force" against those who were reluctant to contribute funds.  He refused the position and quit the organization in protest of the JMA's tactics.  A group of JMA men retaliated.  They came to Budiono's home, where they beat him, sexually assaulted his wife, and stole the family's valuables.  Although Budiono reported this assault to the police, they declined to intervene in what they considered to be a religious conflict.

A couple months later, members of the JMA (falsely) accused Budiono of mismanaging JMA funds.  The police

---

[1] Because the IJ found Budiono's testimony in hearings held prior to the 2006 decision to be credible, we must accept it as true.  *See Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004).

arrested Budiono and, upon taking him into custody, began beating him in an effort to extract a false confession.  The police held Budiono for two days until his wife paid a bribe of five million rupiah, an amount equivalent to about two months' salary.  Fearing further retribution, Budiono and his wife moved to the province of West Java, several hours from Jakarta.  Unable to find work, Budiono and his wife obtained United States visas.  They moved to the United States in July 2000.

Budiono testified that he hoped to return to Indonesia once the situation improved, presumably meaning after the trend toward radical Islam died down.  However, in 2003, Budiono learned that a friend who had recently returned to Indonesia was tortured and killed by a radical Muslim group.  Although that group was not affiliated with the JMA, the friend had rejected the group's radical interpretation of Islam in much the same way that Budiono had rejected the JMA's violent tactics.  That same year, immigration officials served Budiono with a Notice to Appear.  Budiono applied for asylum, withholding of removal, and CAT relief.  Budiono claimed that the death of his friend constituted changed circumstances, excusing the late filing of his application for asylum.

## B.  Procedural History

In 2006, the IJ denied Budiono's applications for relief, granting Budiono voluntary departure.  The IJ rejected Budiono's claim of changed circumstances, reasoning that the death of Budiono's friend did not indicate that the situation facing moderate Muslims in Indonesia had changed significantly since Budiono left.  The IJ therefore concluded that Budiono's application for asylum was time-barred.  *See*

8 U.S.C. § 1158(a)(2)(D); 8 C.F.R. § 1208.4(a)(4). The IJ next determined that Budiono failed to prove past persecution, or a credible fear of future persecution, on any protected ground, disqualifying him from withholding of removal. *See* 8 C.F.R. § 1208.16(b). Alternatively, the IJ held that Budiono was ineligible for withholding of removal because he had contributed material support to the JMA, which the IJ found to be a terrorist organization under 8 U.S.C. § 1182(a)(3)(B). The IJ also denied Budiono CAT relief. *See* 8 C.F.R. § 208.16(c).

Budiono appealed. In August 2008, the Board sustained the appeal and remanded for further factfinding.[2] The Board agreed with the IJ that no changed circumstances excused Budiono's late asylum application. However, the Board remanded for reconsideration of the IJ's denial of withholding of removal. The Board held that, contrary to the IJ's conclusion, Budiono's testimony proved past persecution on account of his religious beliefs. It remanded "to afford the DHS an opportunity to show whether the respondent could relocate in Indonesia or whether conditions have changed so that the respondent no longer possesses a clear probability of persecution . . . ." *See* 8 C.F.R. § 1208.16(b)(1)(A), (B). In addition, the Board remanded for further proceedings to determine whether the JMA was a terrorist organization. The Board held that the IJ's "conclusion on that issue [was] not supported by sufficient findings of fact . . . ."

On remand, the IJ held a second hearing with a dual purpose: to afford the government an opportunity to address the issues of relocation and changed country conditions, and

---

[2] The Board did not address Budiono's eligibility for CAT relief in its 2008 decision.

to gather further testimony from Budiono about the JMA and his role in the organization. The IJ concluded that Budiono had a well-founded fear of future persecution and could not reasonably relocate within Indonesia. Thus, Budiono qualified for withholding of removal. The IJ, however, denied Budiono's application because Budiono had provided material support to the JMA. *See* 8 U.S.C. § 1182(a)(3)(B). The IJ rejected Budiono's testimony about the JMA at the second hearing as not credible; the IJ therefore relied entirely on Budiono's testimony at the first hearing in 2006 to support his factual findings. The IJ found that the JMA "intentionally harmed others as well as property in Indonesia from at least 1998 to 2000" and that "such harm in some instances was inflicted because of . . . religion; and/or decisions being made by the government." The IJ concluded that the JMA was a terrorist organization, and that Budiono's support of the JMA barred him from withholding of removal.

Budiono again appealed the IJ's decision. In May 2012, the Board dismissed the appeal, entering a final removal order. The Board approved the IJ's conclusion that, were it not for the terrorist bar, Budiono would be eligible for withholding of removal, adding that neither party challenged that conclusion on appeal. Nevertheless, the Board affirmed the IJ's conclusion that Budiono was barred from relief due to his material support of the JMA. The Board stated that "the fact that [Budiono's] testimony was often vague as to what type of violence was perpetrated by the JMA does not preclude a finding that the group was a terrorist organization."[3] Budiono timely petitioned for review.

---

[3] The Board also affirmed the IJ's 2006 denial of CAT relief.

## II.

We review de novo the Board's legal conclusions. *Flores-Lopez v. Holder*, 685 F.3d 857, 861 (9th Cir. 2012). We review factual findings for substantial evidence; factual findings should be upheld "unless the evidence compels a contrary result." *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1184 (9th Cir. 2011). Our review is limited to those grounds explicitly relied upon by the Board. *Najmabadi v. Holder*, 597 F.3d 983, 986-87 (9th Cir. 2010). Accordingly, "[w]e review only the [Board's] decision, except to the extent that it expressly adopts the IJ's opinion. Where the [Board] issues its own decision but relies in part on the immigration judge's reasoning, we review both decisions." *Flores-Lopez*, 685 F.3d at 861 (citations omitted).

## III.

Budiono first contends that the Board erred in holding that his asylum claim was time barred. An applicant for asylum generally must request relief within one year of arriving in the United States. 8 U.S.C. § 1158(a)(2)(B). An exception to this rule applies if the applicant can prove "the existence of changed circumstances which materially affect the applicant's eligibility for asylum." *Id.* § 1158(a)(2)(D).

Budiono concedes that he did not apply for asylum until 2003, more than one year after his arrival in the United States. Budiono contends, however, that the 2003 murder of his friend in Indonesia constitutes changed circumstances excusing his late filing. Budiono testified that this event prompted him to apply for asylum because it caused him to realize how dangerous circumstances had become for religious moderates like him.

In 2008, the Board, adopting the IJ's analysis, rejected Budiono's changed circumstances claim.[4]  The IJ reasoned that Budiono fled Indonesia *because* the JMA had radicalized; that is, by the time Budiono left, the group was already subjecting religious moderates to violence.  Thus, the killing of Budiono's friend at the hands of a different Muslim group was not a change from the circumstances Budiono faced before he fled.  We agree.  New evidence confirming what Budiono already knew – that moderate Muslims may face violent repression in Indonesia – does not constitute changed circumstances.  *See Sumolang v. Holder*, 723 F.3d 1080, 1083 (9th Cir. 2013) (finding no changed circumstances where "violence was at most no different in degree from the violence that had been ongoing when [the petitioner] left Indonesia in 1997").  We agree with the Board that Budiono's late asylum filing is not excused.

## IV.

Budiono also contends that the Board erred in concluding that he was barred from withholding of removal due to his material support of a terrorist organization.  We agree.  The IJ failed to make the requisite factual findings to support his conclusion that the JMA was a terrorist organization.  Accordingly, Budiono's support of the JMA cannot bar him from withholding of removal.

---

**[4]** We lack jurisdiction to review a determination that an asylum application was untimely, 8 U.S.C. § 1158(a)(3), unless the petition for review raises constitutional questions or questions of law, *id.* § 1252(a)(2)(D).  In his 2006 decision, the IJ squarely rejected Budiono's argument that his friend's death constituted changed circumstances.  This is a conclusion of law.  Accordingly, we have jurisdiction to review it.

Under the Immigration and Nationality Act, any individual who "has engaged in a terrorist activity" is inadmissible to the United States and thus ineligible for withholding of removal. 8 U.S.C. § 1182(a)(3)(B)(i). An applicant for relief is deemed to have engaged in terrorist activity if that individual has committed "an act that the actor knows, or reasonably should know, affords material support" to a terrorist organization. *Id.* § 1182(a)(3)(B)(iv). A terrorist organization is any group of two or more individuals engaged in "terrorist activity," and terrorist activity is further defined as one of several enumerated activities. *Id.* § 1182(a)(3)(B)(vi)(VI). Those enumerated activities include hijacking, kidnapping, assassination, and, most relevant to this case, "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property." *Id.* § 1182(a)(3)(B)(iii).

An applicant for relief from removal must demonstrate eligibility for the relief sought. *Id.* § 1229a(c)(4)(A); *see also* 8 C.F.R. § 1240.8(d). "If the evidence indicates" that a mandatory bar to relief, such as the terrorist bar, may apply, "the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply." 8 C.F.R. § 1208.16(d)(2) (describing burden of proof for withholding of removal); *see also id.* § 1240.8(d) (describing burden of proof for relief applications generally).

## A. Threshold Evidentiary Showing

We have yet to decide whether the government must first make a threshold evidentiary showing that the terrorist bar may apply and, if so, what showing is sufficient. First, it is

clear from the text of the regulations that the record must contain at least some evidence that the bar applies before the applicant must prove otherwise. The government would have us hold that the applicant's burden of proof arises where the record contains only generalized evidence suggesting that an organization was violent. We decline the government's invitation; instead, we apply the same burden-of-proof framework that we apply in the context of the persecutor bar. In that line of cases, we require a threshold showing of particularized evidence of the bar's applicability before placing on the applicant the burden to rebut it.

Under the persecutor bar, "determining whether a petitioner 'assisted in persecution' requires a particularized evaluation of" two separate requirements: "personal involvement and purposeful assistance." *Miranda Alvarado v. Gonzales*, 449 F.3d 915, 927 (9th Cir. 2006). The persecution must also be based on a protected ground, which would qualify the persecuted individual for refugee status in the United States. *Id.* at 930. Thus, persecution cases are especially instructive because, as with the terrorist bar, the persecution bar consists of several elements. In those cases, we have required threshold evidence of *each* element before the burden of proof shifts to the applicant. Generalized evidence that the applicant was involved with a persecuting group is not enough. The same is true for the terrorist bar.

In *Miranda Alvarado*, we held that the evidence indicates that the persecution bar applies when the evidence is "sufficient to raise the inference that" the bar applies. *Id.* at 930. In *Kumar v. Holder*, 728 F.3d 993 (9th Cir. 2013), we applied and refined that standard. There, we found insufficient evidence in the record to raise the inference that the applicant was personally involved in the alleged

persecution. *Id.* at 999-1000. Thus, we remanded for further factfinding. *Id.* at 1000. Although the applicant in *Kumar* testified that he worked at an interrogation facility in which people were persecuted, there was no evidence to indicate either that he took part in any interrogations or that he was personally present during the alleged persecution. *Id.* at 998–99. Further, the evidence indicated only that the applicant's work assisted the operation of the facility; there was no evidence indicating that the work directly assisted in the persecution of others. *Id.* Faced with these evidentiary gaps, we did not hold – as the government would have us do here – that the persecutor bar should apply because the applicant failed affirmatively to provide evidence *rebutting* the circumstantial evidence suggesting that he might have assisted in persecution. *Id.* Rather, by remanding for further factfinding, we required a threshold showing that each element of the persecutor bar could be met.[5] Likewise, in the

---

[5] This requirement is not unique to the Ninth Circuit. *See Diaz-Zanatta v. Holder*, 558 F.3d 450, 460 (6th Cir. 2009) (requiring evidence that the applicant, who collected and relayed information used to persecute individuals, had "prior or contemporaneous knowledge" of how that information was used); *Xu Sheng Gao v. U.S. Atty. Gen.*, 500 F.3d 93, 100 (2d Cir. 2007) ("Before Gao may be held personally accountable . . . there must be some evidence that he himself engaged in conduct that assisted in the persecution of another.").

We note that, in cases applying the resettlement bar, the applicant bears the burden of proving the bar does not apply only upon the government's submission of specific documents to the IJ. The government "bears the initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely." *Su Hwa She v. Holder*, 629 F.3d 958, 962 (9th Cir. 2010) (quoting *Maharaj v. Gonzales*, 450 F.3d 961, 976 (9th Cir. 2006)). Only when the government has provided this evidence does "the burden shift[] to the alien to show, by a preponderance of the evidence" that the resettlement bar does not

context of the terrorist bar, the record evidence must raise the inference that each element of the terrorist bar could be met before the applicant's burden of proof arises.

It is unreasonable to expect applicants for withholding of removal and other forms of relief to anticipate what bars might apply to their case, and then to affirmatively rebut all of those bars. Such a requirement would also be contrary to the language of the regulations, which assume that the record will contain at least some evidence indicating that a bar applies before the applicant has the burden to disprove it. *See* 8 C.F.R. § 1208.16(d)(2); *id.* § 1240.8. Indeed, a threshold evidentiary showing is especially important in the terrorism context, where the definition of a terrorist organization, and terrorist activity, is unusually broad. *See In Re S–K–*, 23 I. & N. Dec. 936, 948-50 (BIA 2006) (Osuna, Acting V. Chairman, concurring) (discussing the "breathtaking . . . scope" of the statutory language). There must be some initial showing that each element of the statute could be met. Otherwise, we risk rejecting applicants who are in all other respects eligible for relief simply on the basis of a vague association with religious or political fundamentalism.

In the persecution context, we have found evidence that an individual worked at a facility where people were persecuted to be insufficient to indicate that the bar might apply. Similarly, to invoke the terrorist bar, it is not enough for the government simply to assert that an individual was involved with a radical political or religious group. Rather, the record evidence must raise the inference that each element

---

apply. *Id.*; *see also, e.g.*, *Tchitchui v. Holder*, 657 F.3d 132, 135 (2d Cir. 2011); *Firmansjah v. Gonzales*, 424 F.3d 598, 602 (7th Cir. 2005); *Abdille v. Ashcroft*, 242 F.3d 477, 491 (3d Cir. 2001).

of the bar applies. In this case, there must be some evidence indicating that all of the following is true: that the alleged terrorist group consisted of two or more people, who engaged in one of six enumerated "terrorist activities," and that the applicant for relief actually knew of this activity when he provided material support to the group. This framework is consistent with our cases applying the persecution bar, as described above. The framework is also consistent with the Board's decisions applying the terrorist bar. *See id*. at 939, 941 (finding evidence that an alleged terrorist organization "use[d] firearms and/or explosives to engage in combat" with the Burmese government sufficient to raise an inference that the bar applied); *In Re R–S–H*, 23 I. & N. Dec. 629, 640 (BIA 2003) (noting with approval that the government "produced significant evidence to support its position" that the terrorist bar applied).

## B. Application to Budiono

For the terrorist bar to apply, the IJ was required to find that the JMA used "any . . . explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain)" in pursuit of its goals. 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b). The IJ failed to do so.

The JMA is apparently unknown to the U.S. government. Thus, the only available evidence of the JMA's activities is the testimony of Budiono and his wife.[6] That testimony contains no reference to the JMA ever using weapons. Whenever Budiono recalled his own violent persecution by

---

[6] Because the IJ relied solely on testimony from the first hearing in 2006 to support his conclusion on remand that the JMA was a terrorist organization, that is the evidence we consider on this petition for review.

the JMA, he consistently described being "beaten."
Budiono's wife also testified that the JMA beat her husband.
When asked how the JMA beat him, Budiono said, "They
pushed me and then they hit my head and also my stomach."
Budiono never mentioned the use of any weapon.

Budiono also consistently testified that the JMA used
"force" against him and others to promote their radical
beliefs. Budiono did not explain what the "force" entailed,
but he also used the word "force" to describe the physical
beatings he received from JMA members and the police.
Budiono only reported being hit and pushed during these
beatings. Thus, nothing in Budiono's testimony suggests that
the JMA used weapons against their targets. Rather, the
evidence only raises the inference that the JMA physically
beat such individuals.

The government contends that the IJ could infer that the
JMA utilized weapons based on the participation of some
JMA members in the Jakarta riots. But Budiono never
mentioned weapons in relation to the Jakarta riots. Nor did
the government introduce any news articles, reports, or other
evidence indicating that the Jakarta rioters wielded weapons.
The bare fact that many people were killed during the riots
does not suffice to show that members of the JMA,
specifically, used weapons during the riots.

In cases where we have upheld the Board's application of
the terrorist bar, there was much stronger evidence that the
organization met the statutory requirements for terrorist
activity. *See, e.g.*, *Bojnoordi v. Holder*, 757 F.3d 1075, 1078
(9th Cir. 2014) (discussing evidence that the organization
"assassinated six United States nationals" in addition to
staging attacks inside Iran and killing United States military

personnel and civilians working on defense projects); *Khan v. Holder*, 584 F.3d 773, 778 (9th Cir. 2009) (discussing evidence that the organization engaged in "killings, bombings, and attacks on convoys"). By contrast, the JMA's participation in the Jakarta riots does not raise the inference that the JMA, as an organization, used weapons in pursuit of its goals. Likewise, the fact that the JMA beat Budiono after he expressed disagreement with their beliefs says nothing about whether the JMA employed weapons. *Cf. Kumar*, 728 F.3d at 999 (holding that evidence that an applicant worked at a facility where persecution occurred was insufficient to show that the applicant was personally involved in persecution).

In sum, the record supplies no evidence raising the inference that the JMA was a terrorist organization as defined by § 1182(a)(3)(B)(iii). Rather, all of the available evidence indicates the opposite – that the JMA either did not have access to or preferred not to use weapons. Based on this evidence, the IJ determined that the JMA was a terrorist organization because its members "harmed, threatened with bodily harm, and/or damaged property, and . . . such harm was directed toward non-Muslims and/or the government . . . ." These are not the statutory elements of a terrorist organization. The Board recognized this insufficiency on Budiono's first appeal and specifically instructed the IJ to "reconsider the issue of [Budiono's] eligibility based on his alleged material support for a terrorist organization" because "[t]he [IJ's] conclusion on that issue is not supported by sufficient findings of fact regarding whether the group is a terrorist organization, and the respondent's precise role in such group." The IJ failed to do so, relying on exactly the same testimony the second time to find that the JMA was a terrorist organization.

Based on the foregoing, we conclude that no evidence in the record supports the IJ's finding that the JMA is a terrorist organization; therefore, the Board erred in denying Budiono's application for relief under the terrorist bar.

## V.

The Board has twice considered whether Budiono was barred from relief by his material support of the JMA. Both times, the evidence was insufficient to support application of the bar. Indeed, after conducting a second round of hearings, the IJ was unable to uncover any additional evidence of the JMA's activities. Thus, we conclude that the terrorist bar does not apply to Budiono.[7]

"Remand is not appropriate when the [Board] addressed an issue and its opinion is reversed." *Retuta v. Holder*, 591 F.3d 1181, 1189 n.4 (9th Cir. 2010). The IJ concluded on remand that, but for application of the terrorist bar, Budiono was eligible for withholding of removal. The Board upheld that determination on appeal. Thus, because we conclude the terrorist bar does not apply to Budiono, we must conclude that he is eligible for withholding of removal.

We therefore **GRANT** Budiono's petition for review, **REVERSE** the order of removal, and **REMAND** to the Board for further proceedings consistent with this opinion.

---

[7] Because we conclude that Budiono qualifies for withholding of removal, we do not address his CAT claim.

CALLAHAN, Circuit Judge, concurring in part, dissenting in part:

Our government has the solemn responsibility of protecting the American people from terrorist threats, in addition to implementing our complex immigration laws. Terrorist threats come from a range of groups and individuals, including violent extremists in the United States and abroad. Accordingly, as part of our country's counter-terrorism efforts, immigration law provides that where the "evidence indicates" that an alien may have provided material support to a terrorist group, the alien, not the government, has the burden of proof to show that the terrorism bar does not apply. 8 C.F.R. § 1208.16(d). The government must make this low, initial threshold showing that the "evidence indicates" the terrorism bar applies.

I would hold that the government has met its initial burden in this case. It's not clear if the Jemaah Muslim Attaqwa (JMA) is a bona fide terrorist organization, but under these facts and under a deferential standard of review, the government has provided sufficient circumstantial evidence to "indicate" that JMA is a terrorist organization. Budiono is not without recourse, as he may show that the terrorism bar does not apply. The majority's opinion, however, improperly and unwisely inflates the government's low threshold. *See* 8 C.F.R. § 1208.16(d). In doing so, the majority undermines our ability to be vigilant against terrorism.

Even if I were to agree that the government must meet the majority's high threshold to show that the "evidence indicates" that the terrorism bar applies—which I do not—the proper remedy is a remand, not the outright grant of relief. The majority grants relief to Budiono noting that the BIA has

already twice considered whether he was barred from relief and, to the majority, both times the evidence was insufficient. However, the IJ and the BIA misunderstood the appropriate allocation of the burden of proof, as the majority now redefines it, and did not appreciate the amount of evidence required for the government to sustain its burden. Supreme Court precedent requires that we afford the IJ and BIA the opportunity to apply the correct law to the facts in the first instance. *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam); *INS v. Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam). I respectfully dissent from the majority's holding that the government has not met, and cannot meet, its burden of proof and the grant of Budiono's petition for review.[1]

## I.   The terrorism bar

A brief background about the terrorism bar is appropriate. In the wake of a horrific attack on American soil on September 11, 2001, Congress enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) of 2001. Pub. L. No. 107–56, § 411(c), 155 Stat. 272 (2001), 8 U.S.C. § 1182(a)(3)(B). The Act created a new category of terrorist organizations, a "Tier III" designation. 8 U.S.C. § 1182(a)(3)(B)(vi)(III). A Tier III organization is a terrorist organization beyond those groups formally listed by the U.S. government and includes "a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in," a terrorist activity. *Id.* "Terrorist activity" is defined to include an activity "unlawful under the laws of the place where it is

---

[1] I concur with section III of the opinion that Budiono's late asylum filing is not excused.

committed" and which involves one of six enumerated activities, including the use of any "biological agent, chemical agent, or nuclear weapon or device, or [] explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property [or] [a] threat, attempt, or conspiracy to do any of the foregoing." *Id.* at § 1182(a)(3)(B)(iii).

A person who recruits or solicits funds for a terrorist organization or "commit[s] an act that the actor knows, or reasonably should know, affords material support [to a terrorist organization], including . . . funds . . . or other material financial benefit" is deemed to have engaged in "terrorist activity," unless he "can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the [Tier III] organization was a terrorist organization." 8 U.S.C. §§ 1182(a)(3)(B)(iv)(IV)(cc), (V)(cc), (VI)(dd).

These provisions reflect the policy judgments of our elected legislators that terrorism is an evolving and serious threat to national security. *See Hussain v. Mukasey*, 518 F.3d 534, 537 (7th Cir. 2008) ("These definitions are broad, but they are not vague.").

## II. The majority gives short shrift to the standard of review.

We review the BIA's resolution of questions of law de novo. *Bojnoordi v. Holder*, 757 F.3d 1075, 1077 (9th Cir. 2014). The IJ's factual findings, including whether the facts support a finding that an organization is a Tier III terrorist

organization, are reviewed for substantial evidence. *Id.* at 1077–78. Under the substantial evidence standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only supports that conclusion, but *compels* it."). Although the majority pays lip service to this standard, it does not follow the standard.

III.     **Although not conclusive, there is sufficient evidence to "indicate" that JMA is a terrorist organization.**

In this case, Budiono conceded removability. Aliens seeking relief from removal must demonstrate eligibility for the relief sought. *See* 8 U.S.C. § 1229a(c)(4)(A). "If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."[2] 8 C.F.R. § 1240.8(d). I agree with the majority that the "evidence indicates" the applicability of a mandatory bar to relief when it is "sufficient to raise the inference" that the bar applies.[3] Maj. Op. 12. However, I would find that the

---

[2] There is no dispute that the terrorism bar is a mandatory bar to which § 1240.8(d) applies.

[3] To the extent that the majority analogizes the terrorism bar to other mandatory bars, such as the persecutor bar and the resettlement bar, I am skeptical. The Supreme Court has cautioned us from imputing the reasoning and rationale from one mandatory bar into another noting that "we look not only to the particular statutory language, but to the design of

evidence here is sufficient to raise the inference that the JMA met the definition of Tier III terrorist organization including the inference that weapons or other dangerous devices were used.

Budiono was a long-time member of Jemaah Muslim Attaqwa, a group that he admits evolved into a radical, fundamental Islamic organization that advocates violence and the use of force against those who oppose it. JMA members participated in the 1998 Jakarta riots where *thousands* of people died. People began to fear JMA, including Budiono who testified that members of JMA attacked him and sexually assaulted his wife after he reportedly refused to use force when raising funds for the group.

The majority requires that the government show that each element of the terrorism bar has been met. But this heightened requirement is contrary to the plain language of the regulation which only requires that the evidence "indicate" the terrorism bar applies, not that every element must be satisfied. There is no justification to inflate this plainly low threshold. *Cf. Viegas v. Holder*, 699 F.3d 798, 803 (4th Cir. 2012) (holding that "[e]ven if we were to accept Viegas's contention that he did not know he belonged to a terrorist organization, substantial evidence indicates that Viegas reasonably should have known that the organization he belonged to engaged in terrorist activities"). Additionally, it is not a stretch to believe that a radical, violent organization whose members participate in riots, physically attack others, and sexually assault women, uses some weapon in its activities. That Budiono himself was evasive and non-

---

the statute as a whole and to its object and policy." *Negusie v. Holder*, 555 U.S. 511, 519 (2009) (internal quotation marks omitted).

committal about how the JMA enforced its threats is also relevant.  Indeed, when the IJ asked Budiono to clarify what he thought JMA meant when they told him to force people to donate, Budiono responded vaguely "They would do whatever they wanted."

In sum, while there may be no conclusive or direct evidence as to what instrumentalities JMA has used, Budiono described how the JMA evolved into a radical, fundamental Islamic organization that advocates violence and the use of force against those who oppose it.  Accordingly, under the deferential review of the IJ's findings of fact, I would hold that the government has provided sufficient circumstantial evidence to "indicate" that JMA is a terrorist organization.

**IV.    Under the majority's holding, a remand is required as the IJ and BIA erred in interpreting the burden of proof and the amount of evidence sufficient to satisfy that burden.**

Even assuming the government's past evidence was insufficient to indicate that the terrorism bar applied, a remand, not the outright grant of relief is the appropriate remedy.  The majority holds that the IJ and BIA erred in discerning the appropriate legal rules to apply in this case.  The Supreme Court has held that where the BIA has not yet considered an issue, the proper course is to remand to allow the BIA to consider the issue in the first instance.  *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam); *INS v. Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam).  With few exceptions, if the IJ and the BIA have "applied the wrong legal standard, and ha[ve] not considered the issue using the correct standard," we remand the case.  *Fakhry v. Mukasey*,

524 F.3d 1057, 1064 (9th Cir. 2008).  That is what we should do here.

The majority has adopted a new standard which the IJ and the BIA have yet to apply.  First, it holds that the government, not Budiono, had the initial burden to produce evidence with respect to the terrorism bar.  The IJ and BIA both assumed that it was Budiono who had the burden of proof.[4]  The IJ in his first hearing stated that "[g]enerally the burden is on [Budiono] to show that he would not be precluded from relief."  The IJ repeated this standard in his first oral decision by stating "the Court believes that the burden is on [Budiono] to establish ineligibility for any benefit that there are no grounds of ineligibility."  (citing *In re Brantigan*, 11 I. & N. Dec. 493, 494 (BIA 1966)).  The remand by the BIA said nothing with respect to the burden; rather it said that "[u]pon remand the Immigration Judge should also reconsider the issue of [Budiono's] eligibility based on his alleged material support for a terrorist organization" and that the conclusion was "not [at that time] supported by sufficient findings of fact."  The IJ apparently took this as an instruction to describe his findings in more detail, not as a criticism of how he allocated the burden of proof.  The reasonableness of the IJ's approach finds support in the fact that the BIA's second decision did not discuss the burden of proof.[5]

---

[4] This assumption may have been logical given that Budiono conceded removability.

[5] The parties' failure to clearly articulate the burden of proof on appeal further demonstrates that we have adopted a new standard.  The government suggested at oral argument that once it satisfied its burden that Budiono had overstayed his visa and was removable, Budiono then had the burden of proof to show he was entitled to withholding of removal notwithstanding the terrorism bar.  When asked whether the government

However, the majority now holds that the government's initial evidence "must raise the inference that each element of the bar could be met" including that the JMA used an "explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain)' in pursuit of its goals."    Maj. Op. 13–14, 15 (citing 8 U.S.C. § 1182(a)(3)(B)(iii)(V)(b)).    Neither the IJ nor the BIA applied this standard.  Rather, the BIA held: "As noted by the Immigration Judge, the fact that [Budiono's] testimony often was vague as to what type of violence was perpetuated by the JMA does not preclude a finding that the group was a terrorist organization."  Indeed, the government argued not that it was not required to offer specific, direct evidence of the type of weapon used.  This argument was not unreasonable as other circuits addressing the terrorism bar have not discussed whether the government's evidence must raise the inference for each element including that the organization used any "explosive, firearm, or other weapon or dangerous device." *See, e.g.*, *Viegas*, 699 F.3d at 802.

Remand is particularly important here because if the government misunderstood the burden of proof, then it should have the opportunity to make its initial showing.    For example, the IJ did not make a factual finding as to whether JMA, a subgroup of Jemaah Muslim Islameer, was related to Jemaah Islamiyah, a militant Islamic terrorist group designated by the government as a foreign terrorist organization, and responsible for several bombings and training of terrorists.  Because the government may be able to meet the majority's heightened requirement that it further link JMA to the use of weapons or other instrumentalities of

---

had correctly stated the burden of proof, Budiono's counsel answered, "I believe that might be correct."

terrorism, remand is appropriate here.[6] *See Thomas*, 547 U.S. at 186; *Ventura*, 537 U.S. at 16–17; *Fakhry*, 524 F.3d at 1064.

\*　　\*　　\*

Terrorist organizations do not neatly disclose the extent of their activities. Accordingly, although I agree that the government must first make a threshold showing that the terrorist bar may apply, I would hold that the government has met this low threshold through circumstantial evidence. In any event, the appropriate remedy is a remand, not the outright grant of relief. As the majority holds that the IJ and BIA applied the wrong legal standard and, accordingly, have not considered the terrorism bar using the correct standard, we should remand. I dissent.

---

[6] Of course, if the government on remand fails to meet its heightened burden, Budiono will not be prejudiced by the remand as the IJ and BIA will then conclude that the terrorist bar does not apply.